### RAMSEY v. HOME MORTG. CO. et al.*
No. 8.

District Court, E. D. North Carolina, Durham Division.

Jan. 31, 1931.

*For opinion reversing decree, see 49 F.(2d) ——.

A. L. Jordan, of Norfolk, Va., R. T. Allen, of Kinston, N. C., E. S. Merrill, of Norfolk, Va., L. I. Moore, of Newbern, N. C., and R. Clarence Dozier, of South Mills, N. C., for complainant.

Thomas P. Pruitt and W. A. Devin, Jr., both of Hickory, N. C., and Jones Fuller, of Durham, N. C., for defendant Home Mortg. Co.

Jas. H. Pou and Jas. H. Pou, Jr., both of Raleigh, N. C., and F. L. Fuller, Jr., and R. P. Reade, both of Durham, N. C., for defendant First Nat. Bank of Durham.

MEEKINS, District Judge.

This is a cause in equity, presented to the court October 17, 1930, at New Berne, N. C., one of the eight divisions of this district.

After full and careful consideration of the allegations in the bill, the court was of the opinion that a decree should be entered appointing temporary receivers, giving them only technical legal control to the end that the status quo might be maintained, pending an order to show cause why temporary receivers should not be made permanent. Accordingly, the court entered the order of October 17, 1930.

When the bill was presented to the court, the court was advertent to, and had judicial knowledge of, certain facts bearing upon the merits of the bill with regard to the insolvency of the Home Mortgage Company, one of the respondents in this cause, and hereafter called the "Mortgage Company." The facts above referred to are as follows:

There were six corporations in the city of Durham, N. C., known as the "Cobb Group," and among them was the Mortgage Company. Five of these corporations had been placed in the hands of receivers by this court in less than sixty days prior to the filing of the bill, October 17, 1930. The five corporations of the Cobb Group, of which the Mortgage Company was one, making six in all, went into receivership in this court by consent. A careful examination into the affairs of each one of the five corporations of the Cobb Group by the receivers appointed by this court disclosed that each was hopelessly insolvent.

Moreover, all of these corporations, above mentioned, particularly the Atlantic Mortgage Company, and the Mortgage Company, were closely allied and interlocked, their business being inter-related and greatly confused. At the head of these corporations was James O. Cobb, who appears to have been the moving spirit of all the six corporations in the Cobb Group, particularly the Atlantic Mortgage Company and the Mortgage Company.

As to the connections and activities of James O. Cobb with the six corporations, particularly the Atlantic Mortgage Company and the Mortgage Company, it is only necessary to consider the testimony of T. L. Broocks and Leon W. Powell, which testimony is set out in the record.

T. L. Broocks testified before the special master on November 28, 1930, at page 27 of the transcript of his testimony, with regard to the relationship of James O. Cobb as to the Atlantic Mortgage Company and the Mortgage Company. Leon W. Powell, one of the receivers of the New Hope Realty Company, one of the Cobb Group, testified before the special master, on November 28, 1930, with regard to the connections and activities of James O. Cobb with the Cobb Group, particularly the Atlantic Mortgage Company and the Mortgage Company as appears at page 52 of the transcript of his testimony.

During the first week of September, 1930, the fifth corporation of the Cobb Group, the Atlantic Mortgage Company, went into hands of receivers, and during the arguments before this court leading up to the decree for receivers, it was stated, more than once, openly and with emphasis, that the Mortgage Company had entered into a repurchase agreement with the Atlantic Mortgage Company whereby the Atlantic Mortgage Company had a then pending claim against the Mortgage Company for $75,000 by reason of the alleged repurchase agreement.

During the term of the federal court at Durham, the first week in September, 1930, J. E. Owens, executive vice president of the Mortgage Company, sought an interview

624

with this court, and in that interview stated that he was fearful an application would be made for, receivers for the Mortgage Company by the attorney or attorneys for the Atlantic Mortgage Company, as is disclosed in the record of his testimony.

A short time prior to the filing of the bill in this cause, there was carried in the Press of North Carolina, and, so far as this court is advised, never denied, and it also appears in the record of this cause, that the Corporation Commission of North Carolina, the duty of which, among other things, is to enforce what is known as "The Blue Sky Law," called on the Mortgage Company for a financial statement, and after careful consideration by the commission of the statement furnished by the Mortgage Company, the commission revoked the privilege theretofore given the Mortgage Company to sell its stock in North Carolina and revoked the privilege theretofore given to sell its investment certificates in North Carolina.

Full and careful consideration of the allegations in the bill justified the exercise of the discretion inherent in the court to enter the order of October 17, 1930. Considering the bill and the setting of this cause as shown by the facts which the court was advertent to, and had judicial knowledge of, as set forth above, it is perfectly plain that the court could not do otherwise than enter the order of October 17, 1930. Therefore, the suggestion or argument that such order was "improvident," because unusual, is met and disarmed by the compelling facts, which stand out like a diagram, and justify the compulsive course of the court in entering the order of October 17, 1930.

Above every judge the figure of Justice serenely sits holding aloft her scales from which she blows even the dust of prejudice; and every judge, no matter how limited or how great he may be, is bound to do justice. The object of every trial in a court of law or equity is to ascertain the truth of the inquiry by legal testimony and in accordance with law. There should be no delay except that which is caused by taking the time to find the truth. Without taking the time to find the truth, trials, in a legal sense, are not as a nail set in a sure place. Moreover, justice can always afford to wait until all the evidence is heard. These observations answer any suggestion that the determination of this cause, a most important one to all the parties interested, has been delayed a moment longer than was necessary to find the truth. Indeed, the delays, as the record will disclose, have, in each and every instance, been at the request and instance of the respondents in this cause. The court is of the opinion that no unnecessary delays have occurred; that a matter of such great importance necessarily requires time, investigation, and consideration.

This cause came on for hearing while the regular statutory terms of the courts of this district were in session, and more than once the court adjourned in the midst of terms in the various divisions of this district and went to the Raleigh division, thus giving this cause precedence over other civil and criminal business of this district. The court is unmindful of any delay in this cause that could in justice be attributed to the court and any intimation to the contrary is unfounded in fact.

The court, in the consideration and determination of this cause, has no preconceptions that are not subject to correction by the facts and the law in this cause. The court has earnestly and diligently sought to ascertain the truth as reflected by the merits of the cause. The court only desires to do substantial justice to the parties and to fulfill the demands of the paramount rights of all, equally and alike.

A preliminary survey of the controlling factors at issue is important to constructive consideration and requisite to proportionment of the relative rights effected.

The Mortgage Company is the principal on bonds aggregating approximately $10,-000,000 owned by thousands of innocent and unsuspecting investors. This multitude of investors is scattered throughout the United States. These bonds are dependent for their security in the main upon underlying subordinate mortgage real estate collateral, as evidenced by deeds of trust deposited with the First National Bank of Durham, N. C., trustee, one of the respondents in this cause, and hereafter called the "Trustee," under various indentures; there being five in number as disclosed by the record. Some $6,000,-000 of the total of these bonds are guaranteed by the Metropolitan Casualty Insurance Company of New York, with official domicile at Newark, N. J. Some $4,000,000 of these bonds are without guaranty from any source and are solely dependent, as to their value, upon the underlying subordinate mortgage collateral, evidenced by deeds of trust deposited with the Trustee, and the responsibility and solvency of the Mortgage Company.

It is the legal obligation of the Mortgage Company, under the express conditions of the various indentures, above referred to, to keep the underlying subordinate mortgage collateral free from default and without impair-

ment, and to "syncronize" the same with the outstanding bonds, and to pay promptly the interest and principal, evidenced by the bonds and the coupons attached thereto, as such interest and principal becomes due and payable.

It will be seen, therefore, that a trust estate is directly involved in this cause, representing $10,000,000 of bonds which are held by bondholders having no legal representation other than the Trustee and no disinterested protector if the Mortgage Company and the Trustee fail to protect them, and in such failure these bondholders have no recourse other than to appeal to a court of chancery—the warden of trusts and the vigilant legal guardian of the absent, the dependent, and the incompetent. This latter class has the right to rely upon and to invoke the maxim that equity is founded in natural justice, in honesty and right, and properly arises according to what is right and good.

The jurisdiction of the federal court of this district has been invoked, and such jurisdiction cannot be denied except the court has no jurisdiction of the parties or the averments of the bill and the proof adduced fail to establish a cause for equitable relief.

The Mortgage Company is a North Carolina corporation, formerly having its corporate domicile at Durham, N. C., which is within the territorial limits of this district and therefore within the jurisdiction of this court. Two or three months before the institution of this cause, October 17, 1930, the Mortgage Company removed its domicile to Hickory, N. C., which is without the territorial limits of this district and therefore without the jurisdiction of this court.

The Trustee is a United States banking association, having its corporate domicile at Durham, N. C., which is within the territorial limits of this district and therefore within the jurisdiction of this court.

The Trustee in this cause is designated Trustee in all five of the indentures, above referred to, under which these outstanding bonds, above referred to, approximating $10,-000,000, were issued and as Trustee is charged with the important and indispensible obligation of protecting the security and ultimate payment of the bonds referred to and is a necessary party to any action for the administration of the trust imposed upon it as Trustee in connection with the Mortgage Company, and in connection in part with the Metropolitan Casualty Insurance Company of New York, above referred to, as a guarantor of some $6,000,000, of the bonds referred to.

The complainant, a citizen and resident of the state of Virginia, has brought this action against both the Mortgage Company and the Trustee, and as the holder and owner of certain of the bonds, above referred to, of the face or par value of $3,500, issued by and in the name of the Mortgage Company.

This cause, as to territorial venue, is brought under sections 52 and 53 of the United States Judicial Code, otherwise designated as sections 113 and 114 of title 28 of the United States Code (28 USCA §§ 113, 114), and it is not a cause of action of a local character requiring venue in a particular federal judicial district.

This cause of action is based on the alleged insolvency and mismanagement of the Mortgage Company, and upon its default, under the terms of all the trust indentures, above referred to, securing the outstanding bonds above referred to.

This action is not brought by the complainant on her own behalf alone, but it is brought by her on her own behalf and on behalf of all other bondholders and is, therefore, a representative suit and should be, and is, so considered and determined.

The important facts set out in the record and set forth in the pleadings, decrees, orders, motions, and other proceedings in this cause are substantially, and for the present briefly stated, as follows:

1. October 17, 1930. There was presented to the court the original bill of complaint for receivership for the Mortgage Company, duly verified and setting forth various alleged facts of insolvency of the Mortgage Company.

2. October 17, 1930. An order was entered by the court appointing temporary receivers—W. G. Bramham, of Durham, N. C., and T. L. Bland, of Raleigh, N. C.—with rule to show cause why same should not be made permanent, which rule was returnable November 5, 1930.

3. October 18, 1930. Subpœnas and order to show cause why permanent receivers should not be appointed served upon the respondents by the United States marshal, or his deputy.

4. October 20, 1930. An order was entered by the court appointing a special master (Charles B. Calvert) and directing him to employ auditors and to investigate and report to the court as to the solvency or insolvency of the Mortgage Company and such other matters as counsel (both sides) might submit to him.

5. November 3, 1930. General appearance entered by counsel for both the Mortgage Company and the Trustee, and after such general appearance was entered respondents moved, through their counsel, to dismiss; the motion to dismiss being on the merits and filed by both respondents in this cause. This motion was equivalent to a general demurrer to the original bill.

6. November 5, 1930. Supplemental and additional motion, filed subsequent to general appearance and motion to dismiss on the merits on November 3, 1930, as to jurisdiction of the court over respondents. These motions were made in open court in the Wilmington division of this district, all parties present—complainant's counsel and respondents' counsel—at which time there was presented to the court, by counsel, for respondents, certain affidavits, followed by lengthy oral arguments by counsel for respondents to dismiss the cause on its merits.

7. November 5, 1930. In open court motion by counsel for complainant for leave to amend the original bill of complaint filed October 17, 1930, so as to charge mismanagement of the Mortgage Company, which motion to amend was made before respondents' motion to dismiss and the amendment was allowed.

8. November 10, 1930. Order of the court allowing complainant's amendment.

9. November 10, 1930. Order of the court allowing counsel for complainant to take certain testimony in open court on the merits of the cause.

10. November 10, 1930. Motion for continuance of the cause by counsel for respondents and motion allowed.

11. November 15, 1930. Special appeal by counsel for respondents to Circuit Court of Appeals on the interlocutory order entered October 17, 1930, appointing temporary receivers, and as to order entered October 20, 1930, appointing special master, both orders being without notice, which appeal was allowed by the court, and on the next day, November 16, 1930, the appeal was heard by the Circuit Court of Appeals.

12. November 20, 1930. Nunc pro tunc order entered by the court appointing temporary receivers on the amended bill, after hearing in open court on the merits, the same to be operative as of the date of November 5, 1930, referred to in No. 6 above, and on which occasion the court denied respondents' motion to dismiss, and so forth.

13. November 24, 1930. Order entered by the court modifying previous order to take testimony in open court eliminating the privilege theretofore given counsel for the complainant to call officers of the Mortgage Company, and compel the production of its books and other records and allow the complainant and respondents to take testimony in open court.

14. November 24, 1930. Examination in open court of O. M. Hutchinson, resident manager of the auditing firm of Haskins & Sells; that firm at the time was in the process of making an audit of the books and other records of the Mortgage Company, under the direction of the court; the filing and admission of evidence and various statements with regard to the audit and the tender by counsel for complainant to counsel for respondents of certain other witnesses.

15. November 24, 1930. Motion by counsel for respondents to stay and vacate certain proceedings; opinion of the court and memorandum of facts as part of order overruling supersedeas; petition for appeal by respondents from nunc pro tunc order, dated November 20, 1930, referred to in No. 12 above; citation and order allowing appeal to the Circuit Court of Appeals; and answer of respondents to the bill.

16. November 26, 1930. Order of Circuit Court of Appeals denying application for stay of proceedings and appeal from nunc pro tunc order, and so forth, entered November 20, 1930, referred to in No. 12, above.

17. November 28, 1930. Taking of testimony on merits begun by special master with counsel for complainant and respondents present and participating.

18. November 29, 1930. Protests and objections by counsel for respondents to proceedings of the special master and motion to vacate and stay his proceedings, which motion was denied.

19. December 1, 2, and 3, 1930. Taking of testimony by special master on the merits, counsel for complainant and respondents being present and participating. The respondents offered testimony of various officers of the Mortgage Company.

20. December 2, 1930. Order entered by the court at New Berne, N. C., on motion of respondents to produce witnesses in open court on December 6, 1930, in the Raleigh division. Motion allowed.

21. December 4, 1930. Reports, exhibits, and testimony taken before special master filed.

22. December 6, 1930. Testimony taken in open court in the Raleigh division by re-

spondents pursuant to order entered by the court allowing the production of certain testimony in open court under date of December 2, 1930, above referred to in section 20.

23. December 6, 1930. Interlocutory order entered by the court appointing temporary receivers after hearing on merits.

24. December 10, 1930. Petition for appeal by counsel for respondents from order of December 6, 1930, and order allowing appeal.

25. December 27, 1930. Final hearing in open court on the merits with regard to making temporary receivers permanent; all counsel for both complainant and respondents being present and participating.

26. December 27, 1930. Motion by counsel for respondents to take further testimony.

27. December 27, 1930. Motion by counsel for respondents requiring complainant to file additional or increased bond for costs and damages.

28. December 27, 1930. Motion to stay proceedings.

29. December 27, 1930. The three motions, above referred to, were taken under advisement by the court.

30. December 27, 1930. Oral argument at length by counsel for complainant and by counsel for respondents on the merits of the cause and submission of the cause to the court.

31. January 23, 1931. Nunc pro tunc order allowing admission of affidavit as basis to take depositions, which affidavit was presented to the court December 27, 1930, and the motion based on the affidavit was taken under advisement by the court, as stated in No. 29 above; the affidavit being admitted subject to the restrictions set out in the order, January 23, 1931, above referred to. Upon the entering of the nunc pro tunc order respondents abandoned the taking of depositions and made no further motion to take further testimony.

Before a detailed discussion of the various technical motions to dismiss and to stay, some of which were made the basis of certain premature interlocutory appeals to the Circuit Court of Appeals, it is obviously important that there should be a complete understanding of the merits of the cause. If this cause, for any substantial reason, is not well founded in equity and does not demand substantial relief, looking to the broader and larger consideration of justice, apart from mere technical complaint, on the one hand, and mere technical defense, on the other hand, then its dismissal or retention is of small consequence to a court of chancery, endeavoring to administer its duty with impartial and serious performance within the sphere of its requirements.

In this particular cause it is proper—in fact requisite—to bear in mind that the respondents were immediately advised, by service of subpœnas and rule to show cause, after the order was entered on October 17, 1930, above referred to, that a very short time was fixed under the rule to show cause as to whether the order should be made permanent and that the court was always open to the respondents to move to vacate or modify the order, even before the date set down in the rule to show cause.

Moreover, it is undisputed in the record that the temporary receivers of the court appointed in the first instance, October 17, 1930, have exercised only a technical legal jurisdiction over the Mortgage Company and the Trustee.

The temporary receivers have interfered in no way with the usual administration by the regular officers of the business of the respondents in this cause, except as to the disbursements of funds and the audit directed by the court under the supervision of the special master. Therefore the temporary receivers together with the efforts of the special master have, for the first time, established a definite statement of the assets and liabilities of the respondents to the end that all parties interested have been protected and therefore benefited in the premises.

Hereinafter the court will consider the technical aspects and the exercise of its judicial discretion in the order of October 17, 1930, appointing temporary receivers, and the lack of merit in many of the contentions of the respondents with regard thereto according as they appear to the court.

The propriety of the court has been repeatedly challenged by the respondents with regard to the order appointing, without notice, the special master and in the direction given him. The original bill charges, with considerable detail, the insolvency of the Mortgage Company. The main issue raised on the original bill and the amended bill was therefore the financial status of the Mortgage Company and the management of the same. A statement of account as to the assets and liabilities of the Mortgage Company was not only desirable but necessary.

Under rule 59 of the New Equity Rules (28 USCA § 723), promulgated by the Supreme Court of the United States, November

4, 1912, governing the appointment of a special master by a District Court of the United States, there is ample authority for the action taken appointing and directing the special master to fully investigate the financial status of the Mortgage Company and the conduct of the Trustee with regard to the exercise of its duties under the various trust indentures. How otherwise could the court be reliably informed as to the solvency of the Mortgage Company, except by reference to an examiner or special master? It can hardly be seriously contended, or even seriously suggested, that such an inquiry would be feasible, in open court, under the direct supervision of the court. It is so obvious that it is unnecessary to undertake to justify it by argument and the court therefore pretermits discussion of the point except to say that under Equity Rule 46 (28 USCA § 723), providing for taking testimony in equity cases in open court, it is laid down: "Except as otherwise provided by statute or these rules."

If in the same order the special master was directed to investigate and report as to the other matters submitted by respective counsel in this cause, all such matters must have been, and as the proceedings now establish, co-related and germane to the general fact as to the solvency or insolvency of the Mortgage Company and as to the management thereof.

Later the court will dispose of the contentions of the learned counsel for the respondents that the proceedings of the special master were in any proper sense ex parte, and the legal authority of the court, in the appointment and designation of authority of the special master. While the original appointment and direction to the special master as contained in the order of October 20, 1930, above referred to, was without notice, the special master, from the beginning of his service in this cause, as the record will show, has not only continuously given notice in advance, sufficiently in advance, of all his proceedings to all the parties in interest, as is fully substantiated in the exhibits to his report, marked therein as "Master's Exhibits, Morning Session, December 1, 1930, from A to F-1," but in a formal notice of his official and open hearing to take testimony, dated November 26, 1930, addressed and served upon counsel for complainant and counsel for respondents, the special master said as follows: "I shall on Friday, November 28, 1930, at 10 o'clock, A. M., at my office, in the Southern Fire Building, Durham, N. C., hold a hearing as Special Master for

the purpose of taking testimony as to the solvency or insolvency of the Home Mortgage Company, and such other matters alleged in the Amended Bill of Complaint, and the answers thereto, as counsel for either party in said cause shall then request and submit, subject to my authority as aforesaid."

In response to this notice of the special master all parties to this cause fully participated, as the record will show, in all the hearings of the special master, on the merits of the cause, on the following dates, respectively: November 28, 1930, and December 1, 2, and 3, 1930, and at the sessions of the special master, on December 2 and 3, counsel for respondents on their behalf, as the record will show, produced, as witnesses, officers of the Mortgage Company and examined them as to the merits of this cause and filed before the special master certain exhibits to the testimony offered by them, which exhibits are made a part of the special master's report filed in this cause.

It is not only proper but necessary that the court must consider the merits of this cause upon the testimony taken in open court, under Equity Rule 46, and the exhibits filed therewith. Moreover, the exceptions filed to the right of the special master to act by counsel for the respondents are without merit for the reason that the respondents fully participated and legally acquiesced in all the proceedings of the special master, and as the special master has filed with his report all the testimony taken before him, with all the exhibits filed therein, the court will consider such testimony and exhibits as a part of the evidence in this cause, and the report of the special master, as advisory aid to the court in determining the facts of this cause. The testimony so taken by the special master was taken under and by virtue of authority provided by the New Equity Rules, viz., rules 46, 59, 60, 61, 62, 63, 64, 65, 66, and 67 (28 USCA § 723) which rules are binding on all the District Courts of the United States.

As to the question of the solvency or insolvency of the Mortgage Company, the same is not to be answered solely by reference to the ability of the Mortgage Company to meet its own requirements and liabilities apart from its fixed liabilities to take care of the periodic interest payments, and maturing principal payments on the $10,000,000 outstanding bonds and to refinance or reimburse the Trustee for all defaults, in the underlying subordinate mortgage collateral required by the trust indentures to syncronize at all times with such outstanding bonds. The Mort-

gage Company is likewise obligated upon $212,000 collateral trust gold notes, issued through the Union Trust Company of Maryland, Trustee, under which there has been a substantial default in collateral and payment to the Trustee.

In the testimony of O. M. Hutchinson, of the auditing firm of Haskins & Sells, and the exhibits thereto, taken and filed in open court, at the hearing on November 24, 1930, it is established that there exists default in the subordinate collateral under each trust and that the total in all the trusts is as follows:

Mortgage loan notes, secured by deeds of trust, current and not over 30 days past due, $5,092,673.13.

Thirty days past due, $784,049.21.

Sixty days past due, $672,987.62.

Ninety days (over) past due, $1,270,261.-55.

On which deeds of trust have been foreclosed, or in process of foreclosure, $1,504,-026.70.

The witness explained in his testimony that his reference to "past due" meant past due after the grace period of 30 days. It will be seen, therefore, that as a matter of fact, the respective figures of defaults should be stated as follows:

Sixty days past due, $784,049.21.

Ninety days past due, $672,987.62.

Over 120 days past due, $1,270,261.55.

Foreclosures, or in process of foreclosure, $1,504,026.70.

These calculations have reference to October 17, 1930, the date the order appointing temporary receivers, above referred to, was entered.

It will be seen from a careful consideration of the figures above set forth that the total of the defaults, extending over 60 days past due, including trust foreclosures and in process of foreclosure, amount to $4,799,-739.60, out of a total subordinate underlying collateral in all the trusts of $10,073,159.29.

The detailed figures as to the subordinate mortgage collateral is given by reference to the total and the defaults in the exhibits prepared by the auditor and admitted in evidence at the hearing in open court on November 24, 1930, and before the special master November 28, 1930, and are filed and made a part of the special master's report. These figures or calculations have not been challenged in any of the proceedings at any time or anywhere.

On page 114 of the transcript of the testimony of J. E. Owens, executive vice president of the Mortgage Company, is the statement that those foreclosures amount to about $1,500,000.

Tested by the cardinal rule as to the insolvency of a corporation, that is, whether it is able to meet its present and maturing obligations, in the usual course of business, with the use of an honest credit, it appears that the liabilities of the Mortgage Company exceed $545,000, as of October 17, 1930, according to the testimony of O. M. Hutchinson, of Haskins & Sells, taken before the special master, December 2 and 3, 1930, page 216 of the transcript of his testimony. This liability does not include liability on the outstanding bonds and collateral trust notes.

The same witness (Hutchinson) testified at the same time as follows: "Miscellaneous assets comprising notes and accounts receivable aggregating $216,000.00, most of which are doubtful of collection, or, in any event, the amount to be realized from that group of assets is unknown."

The indebtedness of the Mortgage Company, other than outstanding bonds and collateral trust notes, according to the testimony of J. E. Owens, executive vice president of the Mortgage Company, is $337,000 as shown in the transcript of his testimony taken before the special master, page 78, at the hearing of December 2, 1930.

In a prepared statement made by the auditors and an exhibit to the testimony taken in open court on November 24, 1930, and likewise an exhibit filed with the special master's report, it is established by the testimony in this cause that in addition to the current liabilities now existing there would be an additional requirement for the fiscal year beginning November 1, 1930, and ending October 31, 1931, of $385,514.52 over all expected or anticipated assets of the Mortgage Company. In other words, a deficit of that amount is shown by the testimony of the witness (Hutchinson) of Haskins & Sells, taken in open court on November 24, 1930, and reference is made to "Exhibit Estimate" filed therewith. The testimony of the same witness (Hutchinson) before the special master, as appears at page 217, transcript of his testimony, December 2, 1930, and "Exhibit Estimate" filed with the special master's report, is to the same effect.

This requirement of over $385,514.52 is in addition to the present total liabilities, excluding outstanding bonded indebtedness, which is admitted by J. E. Owens, executive

vice president of the Mortgage Company, to be over $300,000, and, as stated by the auditor, exceeds $500,000.

It is in the affidavit, made by J. E. Owens, executive vice president of the Mortgage Company, and offered by counsel for respondents on the merits at the first hearing, in open court, Wilmington division of this district, November 5, 1930, that the financial necessities and difficulties of the Mortgage Company had been such at times in the past that it had been compelled to borrow from "outsiders" securities acceptable to banks for discount or for use as collateral in order to meet the obligations of the Mortgage Company. It appears also that the securities borrowed from "outsiders" to tide over pressing emergencies, had not, on October 17, 1930, the date of the original interlocutory order, in this cause, appointing temporary receivers, been returned to the "outsiders." When a so-called $10,000,000 corporation is reduced to the necessity of such methods, it is reasonably certain such corporation is insolvent. Moreover, such method is reckless mismanagement when kept secret or withheld from all and each of the parties in interest.

It is established in the record that the existing liabilities of over $300,000, admitted by J. E. Owens, executive vice president of the Mortgage Company, have been standing for nearly a year, most of them for a period of over a year, to say nothing as to the amount pointed out by Hutchinson, the auditor, who places the liabilities of this class or character at $500,000.

It appears in the record, transcript of testimony of J. E. Owens, executive vice president of the Mortgage Company, taken before the special master, December 2, 1930, pages 131 and 132, that the Metropolitan Insurance Company of New York, domiciled at Newark, N. J., as guarantor of the interest and principal of over $6,000,000 of the outstanding bonds of the Mortgage Company, has advanced $128,560 to cover matured interest and principal payments, and S. W. Strauss and Company of New York has advanced $100,000 for the same purpose. It also appears in the record that $50,000 of the amount deposited with the trustee was diverted to the use of the Mortgage Company. In this connection the court has considered the testimony of T. M. Gorman, assistant trust officer of the First National Bank of Durham, the Trustee. See page 70 of the transcript of his testimony taken before the special master November 28, 1930. From the record testimony taken before the special

master it appears that the accounts receivable of the Mortgage Company have long since matured and are impossible, or at least in most part doubtful, of collection.

In the testimony of O. M. Hutchinson, of Haskins & Sells, taken in open court, on November 24, 1930, at page 18, he gives his opinion as an auditor, as to the affairs of the Mortgage Company, and says that it is insolvent.

The special master who had the fullest opportunity to know the financial condition of the Mortgage Company says in his report that it is "hopelessly insolvent." The court, after a review of all the evidence before it, can arrive at no other reasonable conclusion.

The amended bill supplements the particular allegation in the original bill as to the insolvency of the Mortgage Company with particular allegations of mismanagement thereof.

The present management, or reorganization management, has been in charge of the affairs of the Mortgage Company since January 29, 1930, and J. E. Owens, executive vice president of the Mortgage Company, claims to have effected a substantial reduction as to the overhead expense. It is well to pause here and analyze the claim. The former president of the Mortgage Company, J. O. Cobb, received a salary of $12,000 annually. J. E. Owens, executive vice president of the Mortgage Company, now receives a salary of $10,000 annually. Owens in his testimony, page 75 of the transcript taken before the special master, December 2, 1930, says: "Since February 1, 1930, through October 1930, a net reduction in overhead and operating expenses of approximately $100,000.00 had been effected when compared with a similar period for the year 1929." The statement sounds well and would be pleasing but for the test that must be applied. It will be seen that against this claim the evidence in the record shows that a large volume of mortgage business was done in 1929, which was previous to the year when Owens was called to the management of the Mortgage Company. Owens took charge January 29, 1930.

The indentures in evidence in this cause, by their respective dates, show that over $2,000,000 was placed or loaned by the Mortgage Company, subsequent to February 1, 1929. $1,000,000 in addition was placed subsequent to November 1, 1928, while the total mortgage business of the Mortgage Company since Owens took charge as executive vice president and headed the management, having first effected the reorganization referred to, placed only from 60 to 75 loans during his adminis-

tration so far as appears from his testimony at page 98 taken before the special master, December 2, 1930, of a total of over 3,000 loans placed by the Mortgage Company since May, 1928, to January 29, 1930. It seems that Owens does not recognize the difference between a liquidating and a going concern. Obviously the expense of the former is necessarily greater than the latter.

It is in the record that prior to the so-called reorganization of the Mortgage Company, subsequent to January 29, 1930, that the deeds of trust, aggregating in amount over $1,000,000, subordinate collateral in the various trusts securing outstanding bonds had been foreclosed by the direction of the Mortgage Company without the consent of the Trustee and "bid in" by the New Hope Realty Company, now in receivership in this court, without paying the purchase money. While no deeds were given to the purchaser by the Trustee, the deeds of trust so foreclosed were not refinanced as required by the terms of the various trust indentures. No purchase price was paid to the Trustee, as above stated, and by a contract between the Mortgage Company and the new Hope Realty Company the rents and profits of the foreclosures were collected and used for the general purposes and uses of the Mortgage Company. Subsequent to the management of J. E. Owens, executive vice president of the Mortgage Company, and the reorganization thereof, a like course was followed, except the contract with the New Hope Realty Company was canceled on account of its financial difficulties and the Realty Sales Corporation was organized by J. E. Owens, executive vice president of the Mortgage Company, for the purpose of substituting it in the place of the New Hope Realty Company as a nominated bidder, so to speak, which Realty Sales Corporation had a total capital stock of only $400, and no actual assets. Owens made no disclosure to the Trustee of his arrangement as to the foreclosures, either as to the New Hope Realty Company or the Realty Sales Corporation until after this action was brought and a few days before he was offered as a witness in this cause.

It will appear that the rents and profits received by the Realty Sales Corporation from foreclosing deeds of trust were used to pay the salary of an officer of the Mortgage Company, amounting to $400 a month, and the balance for the general uses of the Mortgage Company.

The court in careful examination of the method used in conducting the business of the Mortgage Company, and the disregard of the explicit terms of the trust agreements under which it operates, amounting in fact and in law to a diversion of the trust property, being, as it is, a party to the trust, can conceive of no worse form of mismanagement of the affairs of the Mortgage Company, savoring as it does of a fraud upon the bondholders and other innocent creditors. But were these transactions not sufficient to warrant, indeed demand, the protection of a court of equity, the evident unmoral business conception of the executive officer of the Mortgage Company, J. E. Owens, is fully established by the testimony of T. L. Broocks, formerly an officer of the Mortgage Company, which testimony was taken before the special master on November 28, 1930, and is corroborated by James O. Cobb, in his testimony before the special master, formerly president of the Mortgage Company, as will appear from the record of the testimony taken before the special master on December 2, 1930. The testimony of these two witnesses, just above named, established the fact that Owens, in his official capacity as executive vice president of the Mortgage Company, desired, and suggested his desire to his subordinate officers of the Mortgage Company, the destruction of a solemn contract showing a liability of the Mortgage Company to the Atlantic Mortgage Company of $75,000, on the plea that as between the Atlantic Mortgage Company and the Mortgage Company it would be better for the Atlantic Mortgage Company to be sacrificed.

Upon these facts the court has little hesitation in reaching the same conclusion as the witness O. M. Hutchinson, of Haskins & Sells, who testified that the Mortgage Company is insolvent and concurs in the recommendation of the special master that the Mortgage Company is hopelessly insolvent; that the Mortgage Company, under its former and present management, was and is grossly mismanaged and because of the gross mismanagement and insolvency of the Mortgage Company it should be placed in the hands of permanent Receivers.

It was argued at the final hearing, December 27, 1930, on the merits in this cause, by counsel for respondents, that while the witness Broocks and the witness Cobb testified as to the conversation of Owens, the executive vice president of the Mortgage Company, concerning the destruction or suppression of the repurchase agreement the court should take the testimony of Owens, who denied the statement of Broocks and Cobb, on that point, for that (a) Broocks was a discharged employee of the Mortgage Company, there-

fore resentful toward it, which resentment accounted for his testimony with regard to the proposed destruction by Owens of the repurchase agreement, and (b) that Nick Jones, one of the employees of the Mortgage Company, was said by Broocks to have been present when the conversation with regard to destroying the repurchase agreement took place, and that Jones, being offered by the Respondents, stated that he was not present when such conversation took place, if it did, and the point was made by counsel for respondents that the testimony with regard to the destruction of the repurchase agreement was "a stand-off." Counsel for respondents seemed to lose sight of the fact that Broocks was corroborated (reluctantly) by Cobb, who was offered as a witness. Concede, for the sake of the argument, that Broocks asserted the conversation and Owens denied it, and that Cobb did not corroborate Broocks. In this state of the record it would be necessary to weight the human factors involved in the equation. Beyond peradventure it must be conceded that the incentive of a discharged, or even a disgruntled, employee of the Mortgage Company would not be so compelling to perjury as would be the incentive of Owens, assuming that either committed perjury.

When it comes to assigning a motive for speaking falsely, it is apparent that Owens had the stronger motive, stronger than Broocks, because if he had admitted the conversation with respect to the destruction of the repurchase agreement and for the reason assigned, that would have been tantamount to his complete destruction not only with regard to his present position in the Mortgage Company, which pays him $10,000 a year, but with regard to any possible future employment by any reputable and outstanding business concern. With the statement of Broocks, corroborated by the statement of Cobb, the court is impelled to conclude that the conversation took place, as related by the witness Broocks, with regard to the proposed destruction of the repurchase agreement as suggested by Owens. It may be argued that Jones testified that he was not present when the conversation took place, as testified by Broocks. Careful scrutiny of the testimony of Jones leads to but one possible conclusion, to wit, that it is negative testimony. Jones is in the position of the witness who did not hear the clock strike. The record shows, however, that Broocks was not an interested or biased witness and that he was corroborated by Cobb.

The court, now, after particular examination of the evidence in this cause, apart from, and independent of, the special master's report, which is fully and completely supported and justified by the evidence, will take up and consider technical questions of jurisdiction, legality and propriety of its proceedings, and the equitable rights of the parties involved in this cause.

As to the question of jurisdiction over the parties as an essential attribute of the federal jurisdiction in the premises:

Even if the Mortgage Company were the sole respondent in these proceedings, and it were admitted that it had its judicial corporate residence and domicile at Hickory, N. C., which is without the territorial limits of this district, and therefore without the jurisdiction of this court, it cannot avail itself of such a plea to the jurisdiction of this court, after a general appearance by counsel and the filing by them of motion on the merits to dismiss, equivalent to a demurrer to the merits of the cause. The entry of general appearance and motion to dismiss on the merits were made November 3, 1930, prior to the date to show cause set down in the order of October 17, 1930—or three days before the date of the hearing to show cause why the temporary receivers should not be made permanent.

There is no inhibition in the federal procedure of suing a respondent in a jurisdiction other than that in which the respondent resides or has its corporate domicile. The right to be proceeded against, outside of its corporate domicile, is a personal privilege, which may be waived; and a general appearance in the action, and pleading therein to the merits, constitutes such a waiver. In Lively v. Picton et al. (C. C. A.) 218 F. page 401, it is laid down: "Filing by a corporation defendant of a general demurrer and motion to set aside an order appointing a receiver, unless limited, constitutes a 'general appearance.'" See Lee v. Chesapeake & Ohio Ry. Co., 260 U. S. page 653, 43 S. Ct. 230, 67 L. Ed. 443.

In Armstrong v. Langmuir (C. C. A.) 6 F.(2d) 369, page 370 thereof, it is laid down: "A special appearance and motion to dismiss for lack of personal jurisdiction cannot be coupled with a motion upon the merits."

In Interior Construction & Improvement Co. v. Gibney, 160 U. S. page 217, Mr. Justice Gray speaking for the court at page 220, 16 S. Ct. 272, 273, 40 L. Ed. 401, it is laid down: "Defendants who have appeared generally in the action cannot ever object that they were themselves inhabitants of another district." Blount v. Kansas City Southern Ry. Co. (D.

C.) 5 F.(2d) page 967. Panama R. R. Co. v. Johnson, 264 U. S. page 385, 44 S. Ct. 391, 68 L. Ed. 748; Hupfeld v. Automaton Piano Co. et al. (C. C.) 66 F. page 788; Edgell et al. v. Felder (C. C. A.) 84 F. pages 69 and 70; Gulf Smokeless Coal Co. v. Sutton et al., 35 F.(2d) 433, page 438, opinion by Judge Parker, Fourth Circuit.

██ But the jurisdiction of this court does not turn upon the corporate domicile of the Mortgage Company and upon its waiver of the privilege to be sued in the Western Federal Judicial District of North Carolina, and for the reason that the First National Bank of Durham has its corporate domicile within the Eastern Federal District of North Carolina and therefore within the jurisdiction of this court, and is the Trustee named in all of the trust indentures involved in this cause, and therefore is a necessary and indispensible party to this cause, for that its active participation is necessary and indispensible to the proper administration of the trusts and that no effectual relief could be granted on the bill, or by equitable regard to the rights of the parties without the jurisdiction over the bank, as such Trustee.

Under sections 52 and 53 of the United States Judicial Code, otherwise designated as Sections 113 and 114 of title 28 of the. United States Code (28 USCA §§ 113, 114), the Trustee being a necessary party to this cause, the jurisdiction of this court, over the cause and over the parties, is absolute.

██ It has been earnestly argued by counsel for respondents that under the express limitations of the trust indentures in this cause the complainant, an individual bondholder, is estopped from bringing suit; that the right of action is circumscribed and restricted under such trust indentures, which are the contracts under which all bonds were issued and that each bondholder has acquired bonds under such conditions; that these restrictions and conditions are for the mutual benefit of all the bondholders and therefore not within the general inhibitions of the law to restrictions upon general rights of action, to wit, the indispensible right of resort to the courts of the country for the assertion of common rights of the person and to property. The counsel for the respondents mainly relied upon the case of Allan v. Moline Plow Co., Inc. (C. C. A.) 14 F.(2d) page 912.

It is obvious that to understand a legal adjudication one must first understand clearly the facts upon which it is made. Judicial action is the determination of facts as well as law and the application of law to the facts.

In the Moline Case, supra, the facts are essentially different from the facts in this cause. The Moline Case involves the setting aside of conveyances and the collection of debts. There are a number of other cases, dealing with like restrictions in trust agreements, under which bonds or notes have been issued, when such limitations have been upheld.

A careful examination, however, of all this line of cases shows that they were actions to collect debts, such as coupons and bonds, notes, or foreclosure proceedings, where the bond or note holder had restricted action of foreclosure or vested such power in the discretion of a Trustee.

In this cause, the complainant is not suing for a debt, evidenced by her bonds; she is not asking for a foreclosure of a mortgage or of a deed of trust or of an indenture of trust. She is asking only the aid of a court of equity to safeguard and administer her equitable rights, together with the equitable rights of all other bondholders in the trust property.

The application for a receiver for the Mortgage Company does not conflict in any wise with any of the lawful restrictions of the trust indentures involved in this cause.

In the Moline Case, at page 916 of 14 F. (2d), it is laid down: "These provisions were not written into the trust agreement for the benefit and protection of the Illinois Company, but for the benefit and protection of the note holders." Applying this reasoning to this cause, it is sound to so construe the restrictions in the trust indentures for the benefit and protection of the bondholders—to appoint a receiver for a defaulting company, to safeguard and legally administer the trust estate for the benefit of the bondholders, under all the restrictions and conditions of the trust agreement.

The attention of the court has been especially directed to the decisions of the late Justice Pitney while he was Vice Chancellor of New Jersey in the widely cited case, known commonly as the Reinhardt Case. [See Reinhardt v. Inter-State Telephone Co., 71 N. J. Eq. 70, 63 A. 1097.] No one can carefully consider that case, not only from its diction, but from its invincible logic also, and not see its application to this cause as the correct adjudication of the law upon the particular subject matter at issue here.

██ It is, however, suggested by counsel for respondents that under the terms of the trust indentures involved in this cause a right of action is restricted to a proceeding only

through the Trustee, or at least a prior demand upon and a refusal of action by the Trustee, as a prerequisite to individual action of a bondholder for protection of his or her rights as such bondholder.

If the particular bondholder in this cause, bringing this action for herself, and for all the other bondholders, were asking for action under the terms of the trust indentures, that contention might have some force, but this cause is not such a proceeding. Here the action is not to collect interest or principal on any bonds but an application for a receivership for one of the parties, the Mortgage Company, now in default, under the trust agreement.

Besides, under the amended bill in this cause acts of the Trustee are alleged which place it in an antagonistic attitude towards the rights of the complainant and other bondholders. Under such a state of pleadings the Trustee is properly made a party defendant.

In the case of Brown v. Denver Omnibus & Cab Co. et al. (C. C. A.) 254 F. 560, page 567, it is laid down: "The rule that, in general, courts can deal with bondholders only through their trustee, is a rule of convenience, to facilitate the conduct of the suit, and must give way whenever the trustee occupies a position prejudicial to the interest of the bondholders."

It is strange to the court, in this cause, that the particular Trustee, representing the interests of the bondholders, under the spirit and terms of the trust indentures, should have taken a partial position, particularly after the hearings by the special master and his report making no findings against the Trustee which reflect upon it, and recommending receivership for the Mortgage Company to administer the trust in accord and in connection with the Trustee and in strict compliance with the terms and conditions of the various trust indentures.

In Farmers' Loan & Trust Co. v. Northern Pac. R. Co. (C. C.) 66 F. pages 169 and 174, it is laid down: "It is asserted that by this provision the bondholders have expressly agreed that except under peculiar circumstances of request and neglect to sue which do not exist, their rights shall be protected and enforced only by the trustee. I cannot assent to this contention. The provision is restricted to suit by the bondholders to foreclose the mortgage, or to enforce the bonds except through the instrumentality of the trustee, but cannot, I think, be applied to a case where suit has been brought by the trustee, if the conditions would justify a court in admitting the bondholders to intervene. They do not by this provision conclude themselves against the subsequent assumption by the trustee of hostile position or against its violation of duty."

In Lowenthal v. Ga. Coast & P. R. Co. (D. C.) 233 F. 1010, at page 1013, it is laid down: "If it appears that the trustee refuses and neglects to act, or stands in a hostile position, or has assumed a position prejudicial to the interest of the cestui que trust, the rule is put aside and the cestui que trust admitted to represent his right, because in such case the trustee has not or cannot fully and faithfully represent them."

The court has hereinbefore dealt with some of the facts that were before it when the order of October 17, 1930, appointing temporary receivers, was presented and signed. Under the plain law on the subject the court has, upon a proper showing, the legal jurisdiction, to proceed without notice in the appointment of temporary receivers.

In Taylor v. Easton (C. C. A.) 180 F. 363, and at page 367, it is laid down: "The appointment of a receiver without notice is entirely a matter of judicial discretion. The power to make the appointment without notice is inherent in a court of equity. It follows logically that want of notice does not affect the validity of the appointment, in reference to whether it be void, but merely concerns it as being the proper or improper exercise of sound and judicial discretion. An abuse of such discretion would merely render the appointment erroneous, subject to only direct and not collateral attack."

The court has heretofore stated the reason compelling the order of October 17, 1930, without notice, appointing temporary receivers. It was done on a verified bill, giving many detailed transactions that called for prompt and exceptional action to protect the large interests of absent bondholders and other interests from certain detailed acts of the officers of the Mortgage Company. Of some of these matters the court had convincing judicial knowledge because of certain other closely associated judicial proceedings with the Mortgage Company and referred to heretofore, which judicial proceedings were in this court and conducted by this court in respect to receivership for corporations of allied interests and identical mismanagement with that of the Mortgage Company. Besides, the respondents had notice that they could contest the order without notice appointing temporary receivers on the return date thereof, to wit, November 5, 1930.

Again the respondents had the right to appear at any time, upon five days' notice, under Equity Rule 29 (28 USCA § 723), and move to vacate the order without notice, appointing temporary receivers, October 17, 1930.

This the respondents did not do, but entered a general appearance, after notice, on November 3, 1930, and after they had presented their defense on its merits, at least in part, on November 5, 1930, at Wilmington, in this district. The legal effect of this general appearance, after notice, was a waiver of the right to except to the order, without notice, dated October 17, 1930.

In Supreme Council of Royal Arcanum v. Hobart (C. C. A.) 244 F. 385, and at page 390, it is laid down: "After appearing and being heard before the hearing appointed for April 21st, and after having obtained thereby the modifications effected by the decrees of April 17th and April 20th, we could hardly regard the defendant as in a position to claim that any omission of due notice to it in the proceedings has seriously prejudiced its rights."

Subsequently this court, upon the amended bill, and after due notice, and appearance, and presentation of certain matters on the merits, by the respondents, signed a nunc pro tunc order, supra, again appointing such temporary receivers, and after such notice and hearing.

Again, after the submission of the matter on its merits, before the special master, and the filing of the special master's report, this court, on the merits, on December 6, 1930, appointed temporary receivers on the merits as then presented, open to such modification or such order as might be proper after final hearing and argument of the cause, which was then set for December 27, 1930.

The order of October 17, 1930, signed after full consideration of the allegations in the bill and in the circumstances heretofore set forth, was the exercise of not only sound judicial discretion, but was proper and prudent. There may exist a want of proper judicial discretion in failure or refusal to act, where the facts demand action, as there may be an abuse of sound judicial discretion in precipitate or reckless action.

The battle of life is to the strong, the free, the diligent, and the brave. Even so, the administration of law is not in safe hands when characterized by vacillation, evasion, or cowardice.

The order appointing temporary receivers, October 17, 1930, has been justified by the evidence taken in this cause, both in open court, and before the special master. The prudence of the order has been fully established and vindicated.

The facts and circumstances which caused the court to sign the order of October 17, 1930, are entirely different from the facts and circumstances in Nottebaum v. Leckie (C. C. A.) 31 F.(2d) page 556, where the appointment of receivers was made without such intimate judicial knowledge, without notice of any kind, without particular allegations in the bill of sufficient facts to warrant it, and upon a bill without verification or supporting evidence as to the necessity of the immediate appointment of receivers.

Moreover, in the Nottebaum Case the receivers, so appointed, forceably took possession of the offices and affairs of the defendant company. In this cause, the temporary receivers, appointed by the court, October 17, 1930, and continued upon subsequent orders, after full notice, have only, at all times, exercised merely a legal, technical control of the respondents, leaving all the former officers of the Mortgage Company in full possession of its premises, records, and books, and allowing the Mortgage Company, together with the Trustee, to discharge their duties unrestricted, except as to the disbursement of funds for the administrative activities of the Mortgage Company. As stated, no funds of the Mortgage Company have been distributed by the court, or permitted to be distributed by the receivers, except what was necessary to meet the current expense demands incident to the necessary functioning of the Mortgage Company. Not one dollar of the funds of the Mortgage Company has been paid to either of the temporary receivers, or to attorneys for complainant in this cause, or to attorneys for the temporary receivers in this cause, one of whom has done a great deal of work since the temporary receivers were appointed, and has been subjected to considerable outlay of money incident to the expenses of the litigation. The temporary receivers have necessarily had to take care of telephone calls, telegrams, and correspondence in connection with the administration of the affairs of the Mortgage Company, through the necessary co-operation of the temporary receivers with the officers and employees of the Mortgage Company. At most, the court has held the funds and all the rights of the parties in status quo with the exceptions noted just above.

There cannot be any serious question of the judicial right and power of the court to appoint a special master in matters

of account, upon a showing that some exceptional condition requires it, under rule 59 of the New Equity Rules, which govern equity causes in the District Courts of the United States, which rules have always been regarded as having the force of law.

The court stated heretofore and above that the principal matter referred to the special master by the order of October 20, 1930, was a matter of account, impossible of practical performance in open court, under rule 46.

Moreover, in equity jurisprudence, under the rules of the court, this power may be exercised ex parte, or after notice, as the case may be, or with or without consent of the parties to the cause. A special master is a recognized officer of the court to assist the Court in its proper judicial functions, sitting as a court of chancery.

To have required the special master, so designated by the order of October 20, 1930, to employ auditors and investigate and report to the court, as to the solvency or insolvency of the Mortgage Company, was within the power of the court, and to further give the special master the authority to hear and report as to such other matters as counsel might submit, was clearly embraced by necessary deduction, from the power expressly given by Equity Rule 59 as to matter of account.

From the allegations of the bill, as amended, the principal issue in this cause is the matter of the financial condition of the Mortgage Company and the management thereof. All matters that could be properly investigated by the special master, under the authority given him, were matters pertinent and germane to the financial condition and management of the Mortgage Company.

If, for any reason, the respondents had just grievance as to the order, or as to any action of the special master in the premises, they had, at all times, the right to petition the court to rescind, modify, or curtail the action of the special master and to vacate the order itself.

It is fully established in the record of the proceedings of the special master, filed in this court, that the counsel for the respondents, and the respondents themselves, had notice from the special master, and sufficiently in advance, of all his proceedings, and, notwithstanding such notice, they appeared before the special master, on the merits of the cause, on November 28, 1930, and entered their protest before him and then participated in his hearings thereafter and throughout. And

after such participation they moved, on the next day, November 29, 1930, before the court to stay the special master's proceedings in this court. After full hearing on the motion to stay the special master's proceedings, and after full consideration of all the questions presented in the protests, the court refused to stay the proceedings of the special master.

After such refusal by the court, the respondents presented their cause on the merits, before the special master, on December 1, 2, and 3, 1930, and thereafter came into open court and formally entered exceptions to the special master's report, as is required by the rules governing proceedings of special masters. By such appearance on the merits, the respondents placed themselves in position of having consented to all that the special master did, so far as procedure goes—certainly placed themselves in the position of legal acquiescence, both as to the original appointment of the special master and his right to proceed thereafter under the order. The respondents fully participated in all matters before the special master and afterward in open court with regard thereto, after the protest before the court to stay the proceedings of the special master and after the same had been denied by the court.

To repeat: Counsel for Respondents filed an "Objection and Protest" to the special master's proceedings, before him, on November 28, 1930, but that was not the place to first present it. It should have been first presented to the court. Having appeared before the special master on the merits, and having presented their cause before him on the merits, respondents thereby waived any effectual objection to his jurisdiction and the legal effect of their submission to his jurisdiction.

In Flanders v. Coleman (D. C.) 249 F. 757, and at page 758, it is laid down: "The exception that the order of reference to the master is void under equity rule 59, is without merit. The rule does not prohibit a reference of an equity cause to a master. It declares: 'Save in matters of account, a reference to a master should be the exception, not the rule, and shall be made only upon a showing that some exceptional condition requires it.' It is to be presumed that the judge properly exercised his discretion in making the reference. * * * The proper practice would be to move before the judge for a revocation of the reference. The failure to make such motion is tantamount to acquiescence, and the point cannot be initially raised before the master."

In Holt Mfg. Co. v. C. L. Best Gas Traction Co. (D. C.) 245 F. 354 and at page 357, the court considering rule 59 with regard to reference to a special master, it is laid down: "But while these provisions exhibit a purpose to depart from the old method of referring all cases either to an examiner, for the taking of the evidence, or a master, for the purposes of making a report thereon, the very language imports that this restrictive requirement is not intended to be the exclusive method, but that (rule 59) it is to be left to the discretionary power of the court to say what character of case shall be deemed exceptional; and when these provisions are read, as they must be, to determine their scope with all others of a cognate character, of which there are a number * * * they clearly negative any such limiting purpose as is here contended for." Smith et al. v. Brown et al. (C. C. A.) 3 F.(2d) page 926, and Berlin v. Evans (D. C.) 300 F. page 677.

 It is contended by counsel for respondents that the direction to the special master, under the order of October 20, 1930, particularly the employment of auditors, and in placing these auditors in possession of the books and other records of the Mortgage Company, constituted an unlawful invasion of the rights of the company, and an unlawful search and seizure of records, etc. The acts complained of were the acts of the master, an ancient officer of the court of chancery, and therefore the auditors were merely the master's administrative assistants. This investigation by the master, through the assistance of the auditors, did not differ, in legal effect, from a proceeding under a bill for discovery now provided for by interrogatories under Equity Rule 58 (28 USCA § 723). This reference and authority is clearly within the power of the court and the master under Equity Rule 62.

 It was in no proper legal sense a violation of any rights of the Mortgage Company, a corporation, nor of the officers thereof, under the Fourth Amendment to the Constitution of the United States. The protection afforded by that amendment is to a natural person, not to a corporation. The officers of the corporation cannot claim the privilege, as to any search or seizure of the books, records, or papers of the corporation, although the records of the corporation so seized or searched might convict an officer of the corporation of a crime or subject him to a forfeiture.

In Wilson v. U. S., 221 U. S. page 361, 31 S. Ct. 538, 55 L. Ed. 771, Ann. Cas. 1912D, 558, Mr. Chief Justice Hughes, then an Associate Justice of the Supreme Court of the United States, reviews the ancient and modern legal adjudication on the subject of unlawful searches and seizures. There was never any doubt, under this opinion, of the right of a court of chancery to compel discovery, and under subpœnas duces tecum, to compel production of the books and other records of a corporation for examination in a court of Justice. What the court could do then and can do now, under discovery and interrogatories it may do by an examiner or master in chancery.

The case of Boyd v. U. S., 116 U. S. page 616, 6 S. Ct. 524, 29 L. Ed. 746, does not controvert, but on the contrary recognizes, this very doctrine. The Boyd Case decides that an individual, not a corporation, is protected from a search or seizure, when punishment for crime or forfeiture of property was involved. That case, and no other case of respectable authority, has said that the ancient and familiar judicial processes of discovery and interrogatories may not be used in civil proceedings. See also, Wheeler v. U. S., 226 U. S. page 478, 33 S. Ct. 158, 57 L. Ed. 309, and Brown v. U. S., 276 U. S. page 134, 48 S. Ct. 288, 72 L. Ed. 500.

On this same point, the Circuit Court of Appeals for this circuit has expressed opinion, in American Trust Co. v. Alamance Railway Co., decided July 5, 1927, No. 2618, before Waddill, Parker, and Northcott, Circuit Judges, 20 F.(2d) page 791, and at page 792 of the opinion (per curiam). It is held: "Under the federal equity practice there need be no trouble about the production of the books of the bank, as such production may be compelled, and the officers of the bank may be required to answer proper interrogatories, under equity rules 58 and 62."

See also Orvig Dampskibselskab v. N. Y. & Bermudez Co. (D. C.) 229 F. page 293, quoting Mr. Justice McKenna's opinion in Hale v. Henkel, 201 U. S. page 43, 26 S. Ct. 370, 50 L. Ed. 652, at pages 295–296 of 229 F. See also Citizens' Bank of Warrenton v. Moore (C. C. A.) 46 F.(2d) 307; and finally see (as to Master's power to demand books, etc., under Equity Rule 62, etc.) Carson v. American Smelting & Refining Co. (D. C.) 25 F.(2d) 116, page 121.

Moreover, in this cause, the books and other records of the Mortgage Company, at the time of the order to the special master, October 20, 1930, were in the legal custody

of the court, under the appointment of temporary receivers, and all such books and records were properly and regularly subject to the legal jurisdiction of the court and its officers, and open for the purpose of examination and audit by the court, or its properly designated officers. In short, the books and papers of the Mortgage Company were in custodia legis.

 The motive of the complainant has been assailed in the purchase of the bonds she now has as the basis of this cause and the legal maxim of "unclean hands" has been invoked against her. Concede that the complainant purchased her bonds for the very purpose of instituting this cause, and that it was her purpose to apply for receivership of the Mortgage Company, and that the purpose was instigated by outside interests for selfish or unworthy motives, such a course would not be novel in suits of this character, nor novel in a court of justice of any experience. Motives of parties to litigation may be good or bad, selfish or generous, in the interest of moral decency and general justice, or corrupt and repellant. The trial of the motives of the parties litigant has no proper place in a judicial forum—civil side.

It is as easy to ascribe a good motive as a bad one. Personal rights and rights of property are not to be judicially considered and determined by such collateral and irrelevant considerations and investigations. Public rights and private rights, personal rights and property rights, must be decided according to the facts of the case, and not according to the condition or motives of the litigants.

In the case of Dickerman v. Northern Trust Co., 176 U. S. page 181, 20 S. Ct. 311, 44 L. Ed. 423, one James Flanagan brought a suit as bondholder upon certain coupons. It appears the action was inspired by counsel who had represented the defendant company; that by collusion the president of the company appeared before a justice of the peace and confessed judgment; that execution was immediately issued and returned unsatisfied or unpaid; that the trustee collusively gave notice, declaring all the bonds of the company in default, and on page 190 of 176 U. S., 20 S. Ct. 311, 314, of this case the Supreme Court of the United States quoted with approval the case of Morris v. Tuthill, 72 N. Y. page 577, and it is therein laid down: "The facts that the assignor of a mortgage and his assignee acted in concert with the view unnecessarily to harass and oppress the mortgagor, and with intent to prevent payment, to the end that the equity

of redemption might be foreclosed, and they become purchasers for less than the value, do not constitute a defense to an action to foreclose a mortgage. So, also, the facts that the assignee took title from motives of malice, and solely with the view to bring an action, and that the assignor assigned from a like motive, and without consideration, furnish no defense, and do not impeach plaintiff's title. It is sufficient to sustain the action that the mortgage debt is due, has been transferred to and is owned by plaintiff."

The Supreme Court, through the opinion of Mr. Justice Brown, then says: "If the law concerned itself with the motives of parties new complications would be introduced into suits which might seriously obscure their real merits." And Mr. Justice Brown quotes, among others, Toler v. East Tennessee, V. & G. Ry. Co. (C. C.) 67 F. page 168. In this latter case, the opinion is delivered by Circuit Judge Lurton, afterward Supreme Court Judge of the United States.

On page 177 of 67 F., quoting the case of Morris v. Tuthill, supra, Judge Lurton says: "Whether complainants are conducting this suit from good or bad motives, for their own benefit or for the benefit of another, is immaterial. 'It is no defense to a legal demand instituted in the mode and according to the practice of this court that the complainant is actuated by personal or improper motives.'"

In the case of Johnson v. King-Richardson Co., 36 F.(2d) page 675, 67 A. L. R. 1465, Circuit Court of Appeals for the First Circuit, Judge Bingham, speaking for the court, at page 677, it is laid down: "The specific question here raised was passed upon in Hodge et al. v. U. S. Steel Corp. et al., 64 N. J. Eq. page 111, 53 A. 553, 555, and it was held, that: 'Where the only method of protecting or asserting a property right of complainant is in a court of equity, the court cannot refuse to decide or hear a complainant upon the question of right merely because of his improper motive in the acquisition or prosecution of his rights. That the motive of a complainant in prosecuting an equitable property right is to be bought off is not a reason for dismissing the case and refusing to try the question of right.'" This case cites the case of Ramsey v. Gould, 57 Barb. (N. Y.) page 398, which is particularly enlightening on the question of motive and "clean hands."

In Johnson v. King-Richardson Co., supra, it is laid down: "The rule generally prevailing is that, where a suitor is entitled to

relief ·in· respect to the matter concerning which he sues, his motives are immaterial; that the legal pursuit of his rights, no matter what his motive in bringing the action, cannot be deemed either illegal or inequitable; and that he may always insist upon his strict rights and demand their enforcement."

In Bull et al. v. International Power Co., 84 N. J. Eq. 6, 92 A. pages 796, 797, it is laid down: "It is quite universally held that, when a suitor is entitled to relief in respect to the matters concerning which he sues, his motives are immaterial." It is enough, therefore, that the complainant in this action brought this action on her own behalf and on behalf of all the other bondholders as well.

Allied to the defense of attacking the motive of the complainant in this cause, the respondents assert the maxim that the complainant does not bring this suit with "clean hands." It is uncontroverted in this cause that the complainant occupied no relationship to the parties respondent, nor to the property belonging to, or intrusted to them. The complainant did not participate in the mismanagement of the Mortgage Company, and had no part in driving it upon the rock of insolvency. If the complainant had participated in the mismanagement, and therefore been a party thereto, then her hands might not be clean. But, as stated, she is without sin with this regard, for that she was entirely ignorant of, and therefore had no part in, the mismanagement of the Mortgage Company and its subsequent insolvency. It must be conceded, therefore, that so far as the legal status of the complainant is concerned, the maxim of "clean hands" has no application here. See Ramsey v. Gould, supra, Gen. Electric Co. v. Minneapolis Electric Lamp Co. (D. C.) 10 F.(2d) page 851; Baker v. McCarl, U. S. Comptroller General et al., 58 App. D. C. 69, 24 F.(2d) page 897; Talbot et al. v. Independent Order of Owls (C. C. A.) 220 F. page 660.

On December 2, 1930, at New Berne, N. C., the court signed an order on the motion of the respondents, permitting the respondents to examine certain witnesses who resided in Baltimore, Md., and Norfolk, Va., in open court, the purpose being to contradict the complainant as to when she purchased the bonds and to establish that she was not the legal holder of the bonds at the time the bill in equity was presented to the court on October 17, 1930. The court set December 6, 1930, Raleigh division, as the date to hear testimony proposed by respondents. Pursuant to the order of December 2, 1930, the respondents appeared in open court on December 6, 1930, at Raleigh, and offered certain testimony seeking to contradict the complainant as to when and how she purchased the bonds. The court excluded all the testimony offered on the ground that it was incompetent for that it was hearsay. The respondents, through their counsel, later admitted that the testimony offered on December 6, 1930, was incompetent and moved the court, on December 27, 1930, to take the depositions of certain witnesses residing in Baltimore, Md., and as a basis for the motion filed a certain affidavit of James Iredell Jenkins, which affidavit is dated December 23, 1930. The court took the motion of respondents to take depositions under advisement and thereafter, as hereinbefore stated, the court, on January 23, 1931, by consent of all the parties to this cause, admitted the affidavit of Jenkins as substantive testimony, subject to the reservations set out in the order of January 23, 1931. The affidavit was admitted as of December 27, 1930, as the nunc pro tunc order of January 23, 1931, will show. The court will later discuss the affidavit of Jenkins.

Viewing the case from its four corners, it appears to the court that the one outstanding and determinative factor is: Did the complainant own her bonds, the basis of her cause of action, at the time the bill was presented to the court on October 17, 1930, at New Berne, N. C. The complainant testified in substance that sometime prior to the 16th day of October, 1930, she had spoken to her employers, Davis & West, of Norfolk, Va. (note or bond brokers), with regard to purchasing for her a quantity of the bonds of the Home Mortgage Company; that her agent, Davis & West, purchased and delivered to her the bonds in question, she paying Davis & West $3,500 for the same, in cash; and that Davis & West delivered the bonds to her and that she had the bonds in her actual possession at the time her bill in equity was presented to the court, on October 17, 1930. If this testimony is to be believed it cannot be disputed that Davis & West was the agent of the complainant and acted for her throughout the transaction. Therefore, whatever Davis & West did with regard to the transaction was in legal effect the same as if the complainant had acted for herself with regard to the transaction and independently of Davis & West or any other agent. The record shows that complainant is corroborated in part by her attorney, Jordan, who testified that the bonds in question were in the actual possession of the complainant

who delivered the same to him prior to the time the bill in equity was presented to the court on October 17, 1930.

The affidavit of Jenkins speaks for itself. A careful examination of the affidavit, taking it at its full probative force, and granting that the witnesses named, if produced, or the deposition of each, if taken, would in substance be the same as the substance of the affidavit, shows that this evidence does not alter the legal aspects of this cause, nor effect a different determination thereof, and for the reason that the affidavit itself establishes the fact that the complainant, through her agent, Davis & West, purchased the bonds in question, from the Colonial Bond & Share Corporation, of Baltimore, Md., on October 16, 1930. The affidavit shows that the agent of complainant, Davis & West, placed an order for the bonds with the Colonial Bond & Share Corporation by telephone on October 16, 1930; that on the same date, October 16, 1930, the agent of complainant, Davis & West, wrote a letter to the Colonial Bond & Share Corporation confirming the telephone conversation, which letter was received by the Colonial Bond & Share Corporation on October 17, 1930; that on October 17, 1930, the Colonial Bond & Share Corporation wrote the agent of complainant, Davis & West, a letter confirming the reservation of the bonds of complainant; and that on October 17, 1930, the agent of complainant, Davis & West, wrote a letter to the Colonial Bond & Share Corporation, giving full and definite instructions as to how to deliver the bonds and the method of payment therefor, which was by draft attached to the bonds and forwarded to a Norfolk bank for collection.

It appears from the affidavit itself, brushing aside the complainant's testimony as to her ownership of the bonds, for the sake of the argument, that the complainant was the owner of the bonds at the time she instituted this action. Certainly, consideration of the affidavit, together with the testimony of complainant, as to her ownership of the bonds, establishes beyond peradventure that the complainant had sufficient legal interest in the bonds at the time she instituted this action to maintain the same.

The affidavit may tend to impeach the statement of the complainant that she had actual possession of the bonds at the time she instituted this action. But the time of actual possession of the bonds by complainant is immaterial for the purpose of this inquiry. The question here is, not when complainant obtained actual possession of the bonds, but whether she was the legal holder of the bonds at the time she filed the bill.

It is clearly the duty of the court to weigh and value the testimony and evidence submitted in a cause and according as the court may determine the evidence to be it is the duty of the court to find the facts not inconsistent therewith. The court is of the opinion, from all the testimony bearing on the question of when and how and by what method complainant obtained the bonds, the basis of this cause, that complainant was the legal owner of the bonds on or before October 17, 1930, and therefore was within her legal rights when she presented the bill to the court, on October 17, 1930.

The trial court is allowed a broad discretion, in an equity cause, in passing on the evidence before it; is allowed a broad discretion in the admission or rejection of evidence; and is allowed a like discretion in expediting a cause. In this cause the respondents were given the fullest opportunity, at all times, to present their case on the merits.

If the Mortgage Company were solvent, or if it were well managed, or if there was a reasonable prospect of its being well managed, the court would be swift to dismiss the bill; but the Mortgage Company is insolvent and mismanaged, with no reasonable prospect of any improvement with regard to its management, and the cause, therefore, must be retained.

Much has been said by counsel for respondents with regard to the inability of complainant to have laid by so much cash in the time specified by her, being, as she is, a stenographer in a business office at a salary of $30 a week. It is not unusual for people, both men and women, to accumulate money through other means than that which comes through earning one's bread by the sweat of the brow. It is common knowledge that many people are reluctant to divulge information of this character voluntarily. At any rate, there is no testimony in the record that contradicts the complainant on this point. She testifies positively that she had the money and no one has testified that she did not have the money. To say, therefore, that she did not have the money would be to conclude her on conjecture and such conclusion would be tantamount to holding that she spoke falsely. There appears to be nothing in the record to justify so grave a charge as to her.

Much has been said in the argument of counsel for respondents about the "unusual place" in which complainant said she kept the money with which she paid for the bonds

in question. In the stress of the present times, to keep cash in a secret drawer in a desk in one's bedroom may be as safe a place as many another place in which is kept a smaller, an equal, and even a larger amount of cash than that which complainant said she had in the secret drawer and which she used for the payment of the bonds in question, having several hundred dollars remaining in the drawer.

Much has been said by counsel for respondents about the fact that the complainant is rather an insignificant bondholder, owning only $3,500 of the bonds, and is making "a raid" upon a $14,000,000 corporation, alone and unsupported by any other bondholder. In the first place, the Mortgage Company is not a $10,000,000 corporation. It may have once been such a corporation. It is now an insolvent corporation and reprehensibly if not nefariously managed. In the face of the record in this cause to din into the ears of the court that this is a cause involving a complainant with only $3,500 on one side, and the Mortgage Company with $10,000,000 on the other side, is merely a great parade to no purpose. If the bill in this cause were dismissed by the court, it would take a prophet of no great honor in another country, as well as his own, to foretell the future conduct of the Mortgage Company. From this record it is permissible to state that the Mortgage Company, in the event this cause is dismissed, would voluntarily go into a receivership, or would divorce the trusts and thereby permit the trustee to liquidate the business. In the latter eventuality the Mortgage Company would become a mere shell and practically without a local habitation and a name. If the Mortgage Company were sound, if it were solvent, if it were well managed, or if there was a reasonable prospect of its being well managed, it would not only be the duty but the pleasure of this court to dismiss the complainant's bill, but in the circumstances the court has the feeling that to dismiss the complainant's bill would shock the sensibilities of the record in this cause. To repeat, this cause is not "a raid" on a solvent corporation, involving large interests, and great business scope. It is a plain, simple bill in equity, seeking a receivership for an insolvent and mismanaged corporation, and not only on behalf of the complainant but on the behalf of all the other bondholders.

It is true that the complainant is a stenographer and a working girl. It is apparent that she earns her living through daily toil, both before and since she was married. Doubtless she is in more humble touch with the world than the respondents. Nevertheless, she is entitled to exactly the same consideration in a court of equity as the respondents, notwithstanding their broader grasp of material things and their fuller knowledge of the ways of business and of all the world.

Much stress has been laid, by counsel for the respondents, upon the motion to increase the complainant's bond for costs and damages, should the court decree receivership for the Mortgage Company. Counsel for respondents even suggested, in open court, and with all seriousness, that the complainant's bond for costs and damages should be commensurate in amount with the supersedeas bond to stay proceedings in the event the court sustained the bill and appointed receivers. The Circuit Court of Appeals, in this cause, on one occasion required the respondents to give a bond in the sum of $50,000 to stay proceedings for only a few days. Certainly, to stay the proceedings until the Circuit Court of Appeals can pass upon this cause, and thereafter probably the Supreme Court of the United States, this court would not be justified in allowing a bond in a less sum than $50,000. It is clear that to require the complainant to give any such bond would be tantamount to driving her out of court. The court is not advised whether she could give such bond. It may be that she could. But ordinary business prudence would dictate the unwisdom of such course. She probably would reason that it would be better to lose the $3,500 than run the risk of losing $50,000 by way of costs and damages, particularly inasmuch as the cause is being prosecuted by her for the benefit of others as well as herself. What the respondents propose with regard to the amount of the bond complainant should be required to give is in effect a request that the court politely escort the complainant out the door of equity and lock it in her face.

The court has heretofore required the complainant to give a $5,000 bond for costs and damages. She gave the bond promptly. The court costs of the respondents in this cause will hardly approximate, certainly not exceed, $500. Therefore, the bond already given is sufficient to take care of the court costs of respondents. If the court costs do not exceed $500, there will be left, under the bond, $4,500 to take care of damages which respondents may have sustained by reason of this action. The court is of the opinion that

642

the bond for costs and damages heretofore given is sufficient because the court has been very careful to so safeguard this estate that the status quo throughout might be maintained. The funds of the Mortgage Company, as hereinbefore stated, have not been encroached upon, as no allowances have been made from such funds. When the $5,000 bond for costs and damages was given by the complainant, the court thought then the same was sufficient and is of the same opinion now. Respondents moved for bond for costs and damages at Wilmington, November 5, 1930. The court fixed the bond at $5,000, and respondents made no point as to sufficiency of the amount and took no exception. Respondents' first motion to increase bond for costs and damages was at final hearing, Raleigh division, December 27, 1930.

Much has been said by counsel for the respondents, and with great emphasis, about the fact that no other bondholder has joined with the complainant and that because of this fact the complainant's bill should be dismissed. The court fully appreciates the force of the argument, but cannot follow the respondents to such great length. While it is true no bondholder has come forward to sustain the complainant, it is also true that no bondholder has joined in against her. It may be the bondholders are standing on the side lines watching the course in this cause for the reason that they do not wish to come forward and participate and thereby run the risk of having costs and damages to pay. If the bill should be dismissed because no bondholder has joined in with the complainant, then it might be argued with as much force that the bill should be sustained because no bondholder has joined in with the respondents and taken a hostile position against complainant. The bondholders are scattered throughout the United States. Doubtless many of them, possibly 90 per cent. of them, know nothing about this litigation. At most, if the bondholders who know about the litigation continue to stand neutral, it would appear that the argument is as strong for one side as for the other on this point. It is true that the Metropolitan Casualty Insurance Company of New York has taken a hostile position against complainant. But why? It is a guarantor on some $6,000,000 of bonds of the Mortgage Company and recently advanced to the Mortgage Company a large sum of money to take care of the default in interest. It is also true that the Strauss National Bank of New York City has taken a hostile position against complainant. But why? It sold some $4,000,000 of the bonds of the Mortgage Company, and while it did not guarantee the payment of the bonds sold by it, nevertheless its good name is involved and for that reason, and probably that reason alone, the Strauss Company has advanced the Mortgage Company a large sum of money recently to take care of its default in interest. Obviously these two interests prefer to work out their claims without receivership and for reasons best known to each of them.

At the present time no motions are pending before the court, either by complainant or by respondents, which have not been duly passed on. Therefore, the record is complete and the cause has been submitted upon its merits for the final determination of the court.

The court has carefully considered the report of the special master and the exceptions taken thereto, and as the special master has filed with his report a transcript of all the testimony taken before him, together with all exhibits admitted before him, the court has considered the evidence in respect to the master's report, and the exceptions thereto, and also has considered all the evidence and exhibits, independent of the findings and recommendations of the master's report.

Upon review of all the evidence in the cause, regarding the special master's report as embracing proceedings by him with the legal acquiescence of the respondents, the court overrules each and all of the exceptions to the special master's report, and treating the report of the special master as advisory to the court, and only as advisory, as hereinbefore stated, and as if his findings and recommendations had been made on ex parte hearings, which is not true, as the record will show, the court is of the following conclusions:

(a) That the motion by respondents that complainant be required to give additional bond for costs and damages should be, and the same is, denied.

(b) That the motion of respondents to stay these proceedings should be, and the same is, denied.

(c) That permanent receivers for the Mortgage Company, to administer its affairs, under the direction of the court, and that proper administration of the trust property should be carried forward by permanent receivers of the court, fully co-operating in every respect with the Trustee, each and both, receivers and Trustee, acting in all instances in strict compliance with the terms and con-

ditions of the trust indentures, and not otherwise.

The court has industriously and carefully and patiently and open-mindedly considered this cause. Jacob wrestled no harder with the angel. In trying and irksome circumstances, for the most part, the court has kept ever present in mind that the same might be fully followed throughout, the great and soul searching command laid down in Leviticus: "Ye shall do no unrighteousness in judgment; thou shalt not respect the person of the poor, nor honor the person of the mighty; but in righteousness shalt thou judge thy neighbor." Now, the responsibility passes to other shoulders.

Upon the entire record of this cause the court is of the opinion that permanent receivers should be appointed, and will therefore prepare a decree based thereon.